UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| A. C. a minor child, by his next friend, mother and legal guardian, M.C., <br><br> Plaintiff, <br><br> v. <br><br> METROPOLITAN SCHOOL DISTRICT OF MARTINSVILLE, and PRINCIPAL, JOHN R. WOODEN MIDDLE SCHOOL in his official capacity, <br><br> Defendants. | Case No. 1:21-cv-02965-TWP-MPB |

**ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

This matter is before the Court on a Motion for Preliminary Injunction filed pursuant to Federal Rule of Civil Procedure 65 by Plaintiff A.C. a minor child, by his next friend, mother and legal guardian, M.C. ("A.C."). (Filing No. 9.) A.C. initiated this lawsuit against Defendants Metropolitan School District of Martinsville and Principal of John R. Wooden Middle School in his official capacity (collectively, the "School District") seeking declaratory and injunctive relief for violations of Title IX and the Equal Protection Clause of the Fourteenth Amendment. (Filing No. 1.) A.C. seeks to enjoin the School District from restricting his use of male restrooms and requests that Defendants treat him as a male student in all respects. For the following reasons, the Court **grants** the Motion for Preliminary Injunction.

**I.    BACKGROUND**

A.C. is a transgender, 13-year-old boy who lives with his mother, M.C., in Martinsville, Indiana. (Filing No. 30 at 9.) Though designated a female at birth, when A.C. was 8 years old he realized he identified as a boy. *Id.* When he turned 9 years old, A.C. told his mother that he was not a girl and wanted to be referred to by a boy's name and addressed using male pronouns. *Id.*

From that point, A.C. was referred to by his preferred name and addressed with "he" or "they" pronouns. *Id.* A.C. also began presenting himself as a boy, wearing masculine clothing and having a masculine haircut. *Id.* Around this same time, A.C.'s mother contacted his grade school and asked that teachers refer to him by his preferred name and use male pronouns.[1] *Id.* at 10.

A.C. has been given the clinical diagnosis of gender dysphoria, a condition that occurs when there is a marked incongruence between a person's experienced gender and their gender assigned at birth, and is accompanied by clinically significant distress or impairment in areas of their functioning. (Filing No. 29-1 at 4.) He is under the care of physicians at the Gender Health Clinic at Riley Children's Hospital where he is being given medication for menstrual suppression; and he hopes and expects to be taking male hormones in the near future.

When A.C. began school at John R. Wooden Middle School, located within the Metropolitan School District of Martinsville, he was offered the use of the school's single-sex restroom located in the school's medical clinic. (Filing No. 30 at 11.) This accommodation, however, was not convenient for A.C. as he felt singled out and the clinic restroom was far from most of his classes. Because of the distance of the restroom, A.C. was marked tardy several times, which could have resulted in possible discipline. *Id.* at 11. A.C. began to experience anxiety, depression and stigmatization. Due to his struggles, A.C.'s stepfather called the School District and requested that A.C. be allowed to use the boys' restroom. (Filing No. 35 at 6.) The School District denied this request and stated A.C. could continue using the clinic's restroom. *Id.*

Over the frustration with the restroom access, M.C. contacted a transgender advocacy group, GenderNexus, to assist in advocating to the School District on A.C.'s behalf. (Filing No. 30

---

[1] In his opening brief, A.C. also brought claims based on staff members and substitutes referring to A.C. with his previous name and using feminine pronouns. In his reply he withdrew these claims as a basis for the preliminary injunction.

at 12.) A representative from GenderNexus arranged and attended a meeting between M.C., A.C., and the School District. *Id.* The representative provided information about A.C.'s rights as a transgender student and the group discussed the need for A.C. to use the boys' restroom. *Id.* At the end of the meeting, a school counselor said he would ask "higher-ups" about the restroom request. *Id.* After conferring with the principal of the middle school, M.C. was advised that the School District would not allow A.C. to use the boys' restroom, but that it would no longer discipline A.C. for being late to class. *Id.* The counselor also noted that the School District was willing to allow A.C. to switch to remote learning. *Id.*

Contrary to the School District's decision, A.C. began using the boys' restrooms after the meeting. *Id.* at 13. During the three weeks he was able to use the boys' restrooms, A.C. reported that he felt more comfortable at school, his attitude changed completely, and he felt better about himself. Additionally, there were no reported issues or complaints from A.C.'s classmates. *Id.* A staff member, however, saw A.C. using a boys' restroom and reported it to the administration. (Filing No. 35 at 8.) A.C. was called in for a meeting with the school counselor who reminded him that he was not allowed to use the boys' restrooms and would be punished if he continued to do so. (Filing No. 30 at 13.) The School District also advised staff that students should only be using the restrooms of the sex each student was assigned at birth or the clinic restroom. *Id.* Staff were also told to notify the front office when a transgender student requested to use the restroom during class so that student could be monitored for compliance with this policy. *Id.*

The week after his meeting with the school counselor, A.C. was called to the office to meet with the principal. *Id.* The principal told A.C. that he was not allowed to use the boys' restrooms, that he must only use the girls' restrooms or the one located in the clinic, and that he would be punished if he continued using the boys' restrooms. *Id.* at 13-14. M.C. was called during that

meeting and told that if she wanted A.C. to use the boys' restroom, she would need to contact the school board. *Id.* at 14.

Though it was never mentioned to A.C. or his parents prior to initiating this litigation, the School District has an unofficial policy for allowing transgender students to use the bathroom that aligns with their gender on a "case-by-case" basis. *Id.* The factors used by the School District in making these decisions include how long the student has identified as transgender; whether the student is under a physician's care; if the student has been diagnosed with gender dysphoria; if the student is prescribed hormones; and if the student has filed for a legal name and gender marker change. *Id.* After learning about this policy, A.C. submitted documentation from his supervising physician, Dr. Dennis Fortenberry. *Id.* Dr. Fortenberry has not had any direct discussions with A.C., however, he is the supervising doctor at the Gender Health Clinic at Riley Children's Hospital. ([Filing No. 29-1](#).) The School District, however, has not granted A.C. access to the boys' restrooms since receiving this information from Dr. Fortenberry. ([Filing No. 30 at 14](#).) As a result, A.C. reports that his education is being disrupted, "he dreads going to school, is unable to focus there, and comes home depressed and humiliated." *Id.* at 15. And despite the physical discomfort, A.C. sometimes tries to go the entire day without using the restroom at all.

## II. LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008). "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* (citation and quotation marks omitted). Granting a preliminary injunction is "an exercise of a very far-reaching power, never to be indulged in except

in a case clearly demanding it." *Roland Mach Co. v. Dresser, Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) (citation and quotation marks omitted).

> To obtain a preliminary injunction, a plaintiff must establish that it has some likelihood of success on the merits; that without relief it will suffer irreparable harm. If the plaintiff fails to meet any of these threshold requirements, the court must deny the injunction. However, if the plaintiff passes that threshold, the court must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction, and consider whether an injunction is in the public interest.

*Geft Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (citations and quotation marks omitted). Courts in the Seventh Circuit employ a sliding scale approach where the greater the likelihood of success, the less harm the moving party needs to show to obtain an injunction, and vice versa. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc.,* 549 F.3d 1079, 1086 (7th Cir. 2008).

### III.  DISCUSSION

At this stage of the case, the only issue before this Court is whether A.C. is entitled to the preliminary injunctive relief he seeks; specifically, to use the boys' restrooms at his school.[2] To obtain a preliminary injunction, A.C. must establish the following factors: (1) that he is likely to succeed on the merits of both his Title IX and Equal Protection claims; (2) that he has no adequate remedy at law; (3) that he is likely to suffer irreparable harm in the absence of preliminary relief; (4) that the balance of equities tip in his favor; and (5) issuing the injunction is in the public interest. *Geft*, 922 F.3d at 364. The first two factors are threshold determinations. "If the moving party meets these threshold requirements, the district court 'must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied.'" *Stuller, Inc. v. Steak N Shake*

---

[2] In his Complaint, A.C. also requests that he be allowed to participate on the boys' soccer team, but given that soccer season is a number of months away, he elected to not seek injunctive relief on that issue.

*Enterprises, Inc.*, 695 F.3d 676, 678 (7th Cir. 2012) (quoting *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)). The Court will address each factor in turn.

A. **Likelihood of Success on the Merits**

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). To support a Title IX claim, a plaintiff must show (1) that the educational institution intentionally discriminated against the plaintiff based on the plaintiff's sex, and (2) that "gender was a motivating factor in the decision to impose the discipline." *Doe v. Indiana Univ.-Bloomington*, 2019 WL 341760, at *8 (S.D. Ind. Jan. 28, 2019) (quoting *King v. DePauw Univ.*, 2014 WL 4197507, at *10 (S.D. Ind. Aug 22, 2014)). The formative question the Court must answer is "do the alleged facts, if true, raise a plausible interference that [the School District] discriminated against [A.C.] on the basis of sex?" *Doe v. Purdue Univ.*, 928 F.3d 652, 667-668 (7th Cir. 2019).

The Seventh Circuit has held that discrimination against a person on the basis of their transgender status constitutes discrimination based on sex, which is prohibited by both Title IX and the Equal Protection Clause. (Filing No. 30 at 16-17.) In *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Education*, 858 F.3d 1034 (7th Cir. 2017), a transgender student alleged that a policy barring him from using the boys' restroom violated Title IX and the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 1039. The district court granted a preliminary injunction in favor of the student, and the Seventh Circuit agreed. *Id.* The Seventh Circuit held that a school policy that subjects transgender students to different rules, sanctions, and treatment than non-transgender students violates Title IX. *Id.* at 1049-50.

A.C. contends that the Seventh Circuit's decision in *Whitaker* "makes plain that denying A.C. the ability to use the boys' restrooms in his school violates Title IX." (Filing No. 30 at 19.) "A policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX . . . . Providing a gender-neutral alternative is not sufficient to relieve the School District from liability, as it is the policy itself which violates the Act." *Whitaker*, 858 F.3d at 1049-50. A.C. asserts that just like in *Whitaker*, the School District is punishing him for his transgender status and, as the Seventh Circuit has made clear, this violates Title IX. (Filing No. 30 at 21.)

A.C. argues that he will succeed on his Equal Protection claim. *Id.* at 25. As his status as transgender is a classification based on sex, he contends the School District's action is subjected to a form of heightened scrutiny that is somewhere in between rational basis and strict scrutiny. *Id.* With intermediate scrutiny, "the burden rests with the state to demonstrate that its proffered justification is exceedingly persuasive," which requires the state to show that the "classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Whitaker*, 858 F.3d at 1050-51.

A.C. contends the decision of the School District to deny A.C. access to the boys' restrooms was based on concerns about "privacy." *Id.* at 26-27. He points out that in *Whitaker* the court addressed alleged privacy concerns, rejected those concerns and determined that they were "insufficient to establish an exceedingly persuasive justification for the classification." *Id.* Other courts have reached the same conclusions, both for other transgender students seeking restroom access, as well as for non-transgender students seeking to prohibit students from using the restrooms associated with their gender identities. *Id.* at 28 (citing *Parents for Privacy v. Barr*, 949 F.3d 1210 (9th Cir. 2020); *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3d

Cir. 2018)).  For all these reasons, A.C. contends that he will also be successful on his equal protection claim.

In response, the School District argues that A.C.'s request to use the boys' restrooms is unlikely to succeed because Title IX expressly allows institutions to provide separate restroom facilities on the basis of sex.  (Filing No. 35 at 13.)  The School District contends that Title IX's implementing regulations expressly state that institutions "may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex."  34 C.F.R. § 106.33.  The School District asserts that Title IX expressly permits the segregation of facilities on the basis of enduring biological differences in areas where biological differences matter.  (Filing No. 35 at 14.)  Arguing that it is consistent with these regulations, the School District argues that it is complying with Title IX.  *Id.*

The School District argues that A.C. overly relies on the Seventh Circuit's decision in *Whitaker* and that it should be disregarded for four reasons.  *Id.* at 16.  First, the Seventh Circuit has criticized *Whitaker* for using the wrong standard of review.  *Id.* (citing *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762-63 (7th Cir. 2020)).  Because of this, the School District argues that the discussion of the merits in *Whitaker* should have no precedential value.  *Id.*

Second, the School District argues that the court's analysis in *Whitaker* is put in doubt by the United States Supreme Court's decision in *Bostock v. Clayton Cnty, Georgia*, 140 S. Ct. 1731 (2020).  *Id.* While the Seventh Circuit looked to Title VII in deciding *Whitaker*, the School District contends that in *Bostock*, the court expressly declined to extend its ruling as it pertained to sex discrimination in the workplace (which is prohibited by Title VII) to issues pertaining to sex assigned restrooms and locker rooms (which are expressly permitted by Title IX).  *Id.*

Third, the School District argues that the *Whitaker* analysis assumed that the sex stereotyping framework borrowed from Title VII applies in the Title IX restroom context, which *Bostock* does not embrace. *Id.* at 17. The School District asserts that the Supreme Court "specifically reserved this very issue for another day, and *Whitaker* offers no help in understanding why the distinction is 'on the basis of sex.'" *Id.* The School District contends that if requiring students to use restrooms based on sex is unlawful sex stereotyping, then Title IX is itself unlawful. *Id.*

And finally, the School District argues that its position cannot be characterized as sex stereotyping. The School District contends that, consistent with Title IX and its regulations, the School District's position is based on Title IX allowing schools to separate restroom facilities on the basis of sex. *Id.* The School District also asserts that this aligns with the testimony of A.C.'s own expert, who acknowledges that sex is different than gender. *Id.*

The School District also argues that A.C. will not be successful on his Equal Protection claim. *Id.* at 18. The School District agrees that its classification is subject to intermediate scrutiny, but that it can meet the two requirements: (1) that the classification serves important governmental objectives; and (2) the discriminatory means employed are substantially related to the achievement of those objectives. *Id.* (citing *United States v. Virginia*, 518 U.S. 515, 533 (1996)).

The School District first contends that the policy or practice of separate facilities "serves important objectives of protecting the interests of students in using the restroom away from the opposite sex and in shielding their bodies from exposure to the opposite sex." *Id.* Citing a variety of cases on the issue of privacy, the School District argues that if the approach to protect privacy does not satisfy constitutional scrutiny, then neither does Title IX's facilities provisions. *Id.* at 19.

9

Next, the School District argues that its policy is also substantially related to the achievement of these objectives, as it requires that students use the restroom in a separate space from the opposite sex and that this protects against exposure of a student's body to the opposite sex. *Id.* The School District argues that this position does not violate Equal Protection and weighs against granting an injunction. *Id.* at 19-20. Additionally, the School District asserts that any reliance on the Seventh Circuit's decision in *Whitaker* is unreliable as the "analysis wrongly applies Title VII jurisprudence in an area in which the U.S. Supreme Court has not yet gone." *Id.* at 20.

The School District lastly argues that, to the extent *Whitaker* applies, its position of making an individualized determination as to whether a student who identifies as transgender will be allowed access to restrooms different than their sex complies with the law. *Id.* The School District was not provided the type of information it needed prior to the initiation of the lawsuit. *Id.* at 21. Additionally, unlike the plaintiff in *Whitaker* who was a high schooler, the School District A.C. is only a seventh grader and is "less mature" and only "on the threshold of awareness of human sexuality." *Id.* A.C. has not received hormones and at the time this action was filed, he had not completed a legal name and gender marker change. *Id.* At the time of oral argument, A.C.'s legal name change had been granted by the state court; however, on the same day as oral arguments, his gender marker change request was denied by the state court. (Filing No. 41.) Given these differences, as well as the Supreme Court failing to discuss or decide the issue in *Bostock*, the School District argues that it complied with the law in its initial determination to deny A.C. access to the boys' restrooms and in continuing to seek additional information that may alter that determination. (Filing No. 35 at 21.)

The Court finds that A.C. has established a likelihood of success on the merits of his claims. For all its arguments presented both in its briefing and at oral argument, the School District has

10

provided no convincing argument that *Whitaker* does not control and favors A.C.'s likely success on his claims. Whitaker remains good law and thus is binding on this court.[3]

And the School District appears to confuse its Title IX compliance of maintaining separate sex restrooms with the claims A.C. is alleging in this case. A.C.'s claims are based on the School District's treatment of him as an individual, not a complaint that the School District lacks appropriate facilities. A.C. has not requested that additional facilities be built, or the current ones be redesignated in any way. Rather, he is seeking to use those facilities that already exist and align with his gender identity; his claim is solely that the School District is forbidding him from doing so.

Additionally, the School District's arguments that it was not provided enough information prior to the initiation of this lawsuit, as well as its arguments about A.C. not receiving hormones and a gender marker change, fail to undermine the likely success of A.C.'s claims. The School District's transgender policy is unwritten and was not provided to A.C. until *after* the initiation of this lawsuit. Further, there was no evidence presented that taking hormones and receiving a gender marker change on one's birth certificate are required prerequisites to identify as a transgender person, much less that either of these factors would automatically authorize A.C. to use the boys' restrooms. In fact, at oral argument, counsel for the School District was unable to say whether a gender marker change or receiving hormones would be enough for the School District to change its decision regarding A.C. using the boys' restrooms. Instead, counsel was only able to say that he thought it would have "significant impact" on the decision.

---

[3] The Court perceives that the School District is aware of the controlling nature of *Whitaker* given that at oral argument counsel for the School District admitted that this Court "isn't in a position to overrule *Whitaker*" and made clear that the arguments were being presented "for the purposes of our record . . . if this did go up on appeal."

Given the evidence before this Court and the controlling precedent from the Seventh Circuit, the Court finds that A.C. has established a likelihood of success on the merits of both his Title IX and Equal Protection claims.

**B.     Irreparable Harm, Inadequate Remedy at Law, and Balance of Harms**

As argued by A.C., it is well-established that the denial of constitutional rights is irreparable harm in and of itself. (Filing No. 30 at 29.) Based on a violation of his equal-protection rights, A.C. contends that he has established irreparable harm. *Id.* at 30. Additionally, A.C. asserts that he has established that the School District's actions caused him ongoing emotional harm and distress, for which there is no adequate remedy at law. *Id.*

A.C. also argues that because he has established a substantial likelihood of success on the merits, "no substantial harm to others can be said to inhere" from the issuance of an injunction. *Id.* at 32 (citing *Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville*, 274 F.3d 377, 400 (6th Cir. 2001)). An injunction will only force the School District to conform its conduct to the requirements of the Constitution and federal law, which cannot be harmful to the School District. *Id.*

In response, the School District argues that the balance of harms weighs against A.C.'s request to have access to the boys' restrooms. (Filing No. 35 at 22.) The School District notes that it has made accommodations to allow A.C. more time to use the restroom, and the fact that he may occasionally be late to class is not evidence of irreparable harm. *Id.* The School District disputes that A.C. has been ostracized for the use of the clinic's restroom, and points out that unlike the single restroom accessible for Whitaker which invited more scrutiny and attention from peers, the clinic restroom is available for use by all students with permission from the school nurse. *Id.* It argues Concerning A.C.'s expert, the School District asserts that Dr. Fortenberry,

> has not participated in the care of A.C., has not had any direct discussion with A.C. or M.C., has not performed any individualized assessment as to the severity of harm

>that A.C. will experience if not allowed to access the boys' restroom, and has not performed an individualized assessment of the reduction of harm if A.C. is allowed access to the boys' restroom.

*Id.* Finally, the School District argues the balance of harms analysis favors maintaining the status quo. *Id.* at 23. Granting "unrestricted access" to A.C. to use the boys' restrooms would violate the privacy interests of other students and classmates, as well as cause the School District to be unable to rely on Title IX's regulations. *Id.*

The Court is not persuaded by the School Districts arguments. Although any student may use the restroom in the clinic, in order to do so the student (including A.C.) must enter the health clinic, ask permission from the school nurse and then sign in before they may use that restroom. This process appears to invite scrutiny and attention. In support of his Motion, A.C. provided a declaration in which he described feeling stigmatized and that being excluded from the boys' restrooms "worsens the anxiety and depression" caused by his gender dysphoria and makes him feel isolated. (Filing No. 29-3 at 5.) He affirms that the School District's decision "makes being at school painful." *Id.* A.C.'s mother also reported that the issues with the restroom have been emotionally harmful to A.C. and that she is concerned for the possible medical risks associated with him trying not to use the restroom during school. (Filing No. 29-2 at 6.) Like other courts recognizing the potential harm to transgender students, this Court finds no reason to question the credibility of A.C.'s account and that the negative emotional consequences with being refused access to the boys' restrooms constitute irreparable harm that would be "difficult—if not impossible—to reverse." *J.A.W. v. Evansville Vanderburgh Sch. Corp.*, 323 F. Supp. 3d 1030, 1039 (S.D. Ind. 2018) (quoting *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 788 (7th Cir. 2011). Likewise, a presumption of irreparable harm exists for some constitutional violations. *See Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011).

Additionally, the Court finds that there is no adequate remedy at law to compensate A.C. for the harm he could continue to experience. While monetary damages may be adequate in the case of tort actions, the emotional harm identified by A.C. could not be "fully rectified by an award of money damages." *J.A.W.*, 323 F. Supp. 3d at 1039-40; *see also Whitaker*, 858 F.3d at 1054.

Finally, the Court must evaluate the balance of harms to each party. While A.C. has provided evidence of the harm he will likely suffer, the School District's alleged potential harm is unsupported. No student has complained concerning their privacy. The School District's concerns with the privacy of other students appears entirely conjectural. No evidence was provided to support the School District's concerns, and other courts dealing with similar defenses have also dismissed them as unfounded. *See Whitaker*, 858 F.3d at 1052; *J.A.W.*, 323 F. Supp. 3d at 1041. Moreover, the School District's concerns over privacy are undermined given that it has already granted permission for other transgender students to use the restroom of their identified gender, and it has presented no evidence of problems when the other transgender student have used restrooms consistent with their gender identity.

Because A.C. has demonstrated that he will likely suffer irreparable harm, and the School District has failed to support its claims of prospective harm, the Court finds that the balance weighs in favor of granting A.C.'s request.

**C.     Public Interest**

Finally, A.C. argues that "[t]he public interest is also furthered by the injunction here, as an injunction in favor of constitutional rights and the rights secured by Title IX is always in the public interest. (Filing No. 30 at 33.) In response, the School District argues that public policy weighs in its favor. Based on its assertion that Title IX favors the separation of facilities, the School District contends that its policy furthers the interest of personal privacy. (Filing No. 35 at

24.) The School District argues "[t]o the extent that Title IX should not allow the separation of such facilities, that decision should be made through elected representatives in Congress, using clearly understood text, or through the notice and comment process for the revision of federal regulations required by the Administrative Procedure Act." *Id.*

While acknowledging that the public interest favors furthering individual privacy interests, the Court does not believe that granting A.C. access to the boys' restrooms threatens those interests. The restrooms at the middle school have stalls and as argues by A.C.'s counsel, restrooms are an area where people are usually private which minimizes exposure of a student's body to the opposite sex. Since he was eight years old, A.C. has identified as male, and has dressed as a boy and had a boy haircut. He is under a physician's care, has been diagnosed with gender dysphoria, and has been granted a legal name. The School District's arguments regarding its facilities again confuses the basis of A.C.'s claim, which is solely based on the School District's treatment of him as an individual. Having determined that granting A.C.'s Motion is in the public interest, as well as A.C. establishing the other required factors, the Court finds that A.C.'s requested preliminary injunction should be **granted**.

### IV. CONCLUSION

The overwhelming majority of federal courts—including the Court of Appeals for the Seventh Circuit— have recently examined transgender education-discrimination claims under Title IX and concluded that preventing a transgender student from using a school restroom consistent with the student's gender identity violates Title IX. This Court concurs. For the reasons stated above, A.C.'s Motion for Preliminary Injunction (Filing No. 9) is **GRANTED**. The School District shall permit A.C. to use any boys' restroom within John R. Wooden Middle School.

**SO ORDERED.**

Date: 4/29/2022

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Stevie J. Pactor
ACLU OF INDIANA
spactor@aclu-in.org

Kathleen Belle Bensberg
Indiana Legal Services
kathleen.bensberg@ilsi.net

Megan Stuart
INDIANA LEGAL SERVICES, INC. (Bloomington)
megan.stuart@ilsi.net

Jonathan Lamont Mayes
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
jmayes@boselaw.com

Mark Wohlford
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
mwohlford@boselaw.com

Philip R. Zimmerly
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
pzimmerly@boselaw.com