# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

A. C. a minor child, by his next friend, mother and )
legal guardian, M.C.,                              )
                                                   )
                    Plaintiff,                      )
                                                   )
              v.                                    )    Case No. 1:21-cv-02965-TWP-MJD
                                                   )
METROPOLITAN SCHOOL DISTRICT OF                     )
MARTINSVILLE,                                       )
                                                   )
                    Defendant.                      )

## ORDER ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND PARTIES MOTIONS FOR LEAVE TO FILE SURREPLY AND SUR-SURREPLY

This matter is before the Court on Plaintiff A.C., a minor child, by his next friend, mother and legal guardian, M.C.'s ("A.C.") Motion for Partial Summary Judgment. (Filing No. 123). Also pending are Defendant Metropolitan School District of Martinsville's (the "School District") Motion for Leave to File Surreply (Filing No. 148) and A.C.'s Motion to File Sur-Surreply (Filing No. 151). A.C. initiated this lawsuit against the School District seeking declaratory and injunctive relief for violations of Title IX and the Equal Protection Clause of the Fourteenth Amendment (Filing No. 116). A.C. seeks to enjoin the School District from restricting his use of male restrooms and requests that they treat him as a male student in all respects. A.C. seeks summary judgment in his favor on the issue of liability and asks for a permanent injunction to be entered. For the following reasons, the School District's Motion for Leave to File Surreply and A.C.'s Motion for Partial Summary Judgment are **granted** and A.C.'s Motion to File Sur-Surreply is **denied.**

## I.    BACKGROUND

The facts stated below are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, they are presented in the light most favorable to the School District as the

non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## A.     Factual Background

A.C. is a 15-year-old transgender boy who is currently a sophomore at Martinsville High School ("Martinsville High") (*see* Filing No. 29-3 ¶ 4; Filing No. 123-3 ¶ 3). When this action was initially filed, A.C. attended John R. Wooden Middle School ("Wooden Middle") (Filing No. 29-3 ¶ 3).  Wooden Middle and Martinsville High both receive federal funding (Filing No. 117 ¶ 61).

### 1.     Background as Relevant to Transgender People

Transgender rights have been regarded as one of the new frontiers in the fight for human rights and equality. But understanding transgender rights requires a thorough and nuanced understanding of sex, gender, and identity. As an initial matter, the Court will discuss topics and terminology relevant to the transgender discourse.

#### a.     Definitions

Gender identity is a well-established concept in medicine that refers to one's sense of self as congruent with a particular gender (Filing No. 123-1 ¶ 13). For many people, gender identity is congruent with one's anatomical features, so that persons born with a penis and testes are identified as male at birth and subsequently identify as male; persons identified at birth by the presence of a vulva subsequently identify as female. *Id.* ¶ 14. Transgender and gender nonbinary people, however, have a much different experience with gender.

The terms transgender and nonbinary are not interchangeable. Transgender is a broad term that is used to describe people whose gender identity is different from the gender they were thought to be when they were born.[1] A transgender person whose birth-assigned sex is male will experience

---

[1] Advocates for Trans Equality, *Understanding Transgender People: The Basics* (Jan. 7, 2025 3:13 PM), https://transequality.org/issues/resources/understanding-transgender-people-the-basics.

their gender as a female and a transgender person whose birth-assigned sex is female will experience their gender as a male. *Id.* ¶ 15. Nonbinary is used to describe people whose gender is not male or female.[2] Most transgender people are not nonbinary; most transgender people have a gender identity that is either male or female, and they should be treated like any other man or woman.[3]

Gender experience/identity is not a "choice", and it is not indicative of a medical or psychological pathology. *Id.* ¶ 17. According to survey research conducted by the Centers for Disease Control and Prevention, 0.5% of adults and 0.91% of 13-17-year-olds in Indiana identify as transgender. *Id.* ¶ 16.

      **b.**    **Effects of Gender Dysphoria**

Gender dysphoria is an accepted diagnosis for individuals with a gender identity that differs from social gender expectations associated with the person's birth-assigned sex. *Id.* ¶ 12. For a person with gender dysphoria, the incongruence of experienced gender and birth-assigned sex creates a constant sense of distress that can be manifested by symptoms such as preoccupation with expressing the characteristics of one's experienced gender, hiding or modifying the sex characteristics associated with one's assigned sex, and acquiring the sex characteristics of one's experienced gender. *Id.* ¶ 18. Untreated, gender dysphoria is characterized by chronic and significant distress, and associated with clinically significant anxiety and depression, self-harming behaviors, substance abuse, and suicidality. *Id.* Research demonstrates that up to 51% of

---

[2] National Center for Transgender Equality, *Understanding Non-Binary People: How to Be Respectful and Supportive* (Jan. 7, 2025 3:13 PM), https://transequality.org/sites/default/files/docs/resources/Understanding-Non-Binary-July-2016_1.pdf

[3] *Id.*

transgender and gender nonbinary young persons have attempted suicide at least once, compared to 14% of adolescents without gender dysphoria. *Id.* ¶ 19.

c.    <u>**Treatment Protocols for Gender Dysphoria**</u>

Treatment of gender dysphoria is aimed at alleviating the distress associated with incongruence between gender identity and birth-assigned sex. *Id.* ¶ 23. Specific treatment for gender dysphoria will vary based on individual assessments, family considerations, and medical need, but involves mental health and physical assessment, counseling, and support for social transition. *Id.* ¶ 26. An essential element of treatment is identification and amelioration of sources of day-to-day distress associated with the young person's gender identity and expression. *Id.* The goal is to develop an integrated and positive self-image, thus experiencing "identity integration" where being transgender is no longer the most important signifier of one's identity. *Id.* ¶ 27.

The World Professional Association for Transgender Health ("WPATH") Standards of Care recognize that assisting transgender people in social role transition is an essential component of amelioration of gender dysphoria. *Id.* ¶ 31. Social role transition allows a person to express themselves in a manner consistent with their gender identity. *Id.* Use of public facilities that correspond to one's lived gender experience and expression, and feeling safe in those facilities, is integral to social recognition of one's identity. *Id.* ¶ 34. Being denied the use of toilet facilities that are consistent with expressed gender is experienced as an ever-present source of distress and anxiety. *Id.* Research shows that among transgender and gender nonbinary young people denied access to school bathroom facilities consistent with their gender identity, 85% reported depression, 60% seriously considered suicide, and about 33% reported a past-year suicide attempt. *Id.* Allowing transgender people access to restrooms consistent with his or her expressed gender will help prevent gender dysphoria. *See id.* ¶¶ 35-37.

###    2.    <u>An Introduction to A.C.</u>

A.C. is transgender (<u>Filing No. 29-1</u> ¶ 42). Though designated a female at birth, when A.C. was in elementary school he realized he identified as a boy (<u>Filing No. 29-3</u> ¶ 4). When he turned nine-years-old, A.C. told his mother that he was not a girl and wanted to be called a boy's name and addressed using male pronouns. *Id.* ¶ 6. From that point on, some of A.C.'s family and friends referred to him by his preferred name and male pronouns. *Id.* ¶ 5. During this time, A.C. also began presenting himself as a boy wearing masculine clothing and having a masculine haircut (<u>Filing No. 29-3</u> ¶ 7).

Once A.C. was treated as a boy, his family saw improvements in his emotional and psychological wellbeing (<u>Filing No. 29-2</u> ¶ 10). Having people accept him for whom he is reduced his depression and anxiety, making him happier. *Id.* However, when misgendered, A.C.'s depression and anxiety worsens. *Id.* At times, A.C.'s grandmother and those unrelated to A.C. would refer to him by his birth name or use female pronouns (*see* <u>Filing No. 125-2</u>). Before A.C. began receiving gender-affirming care, he had conversations with his mother indicating that he would rather be dead than be stuck in a girl's body (<u>Filing No. 123-3</u> ¶ 5). A.C. would cut on himself due to his depression and anxiety. *Id.* ¶ 4.

###    3.    <u>A.C.'s Medical Treatment</u>

In 2021, A.C. was referred to the Gender Health Program at Riley Children's Hospital where he was evaluated and diagnosed with gender dysphoria (<u>Filing No. 123-1</u> ¶ 38; <u>Filing No. 29-2</u> ¶ 14). He was prescribed medication to stop his periods, which he no longer takes as he no longer menstruates (<u>Filing No. 123-3</u> ¶ 27). The only medication A.C. takes now is testosterone. *Id.* He self-administers the testosterone once a week through an injection. *Id.* ¶ 28. Physical changes consistent with the effects of the testosterone are visible, including facial hair growth and voice deepening (<u>Filing No. 123-1</u> ¶ 46).

In addition to A.C.'s physical changes, some legal changes have been made as well. Between his seventh and eighth grade years, a judge granted an order changing his gender marker on his birth certificate to male (Filing No. 123-4 ¶ 6). His legal name had been changed to the preferred name he has been using for years. *Id.* A.C.'s birth certificate now indicates his preferred name and that he is male (Filing No. 123-5 at 9:3-16). The School District is aware of these changes and have changed its official records to reflect A.C.'s male gender. *Id.*

### 4. A.C.'s Educational Experiences

#### d. Attending Wooden Middle

During the 2021-2022 school year, A.C. attended Wooden Middle (Filing No. 29-3 ¶ 3). The boys' restroom at Wooden Middle had multiple stalls with doors and urinals with dividers between them (Filing No. 29-4 at 48:24-49:8). A.C. was not allowed to use the boys' restroom but was instructed to use the single-person clinic restroom (Filing No. 29-3 ¶ 20). Using the single-person clinic restroom was inconvenient because it was far away from A.C.'s classes. *Id.* ¶ 21. At times, A.C. was marked tardy because of the delay in using the far away clinic restroom. *Id.* Using the single-person clinic restroom was also problematic because it singled A.C. out and did not allow him to be himself at school. *Id.* ¶ 22. Because of how inconvenient and problematic using the single-person clinic restroom was for A.C., he tried not to use the restroom at all during the school day. *Id.* ¶ 22. Not using the restroom while at school caused A.C. physical discomfort. *Id.*

Due to his struggles, A.C.'s stepfather called the school and requested that A.C. be allowed to use the boys' restroom (Filing No. 29-4 at 38:22-39:7). The School District denied this request but stated that A.C. could use the girl's restroom or continue using the single-person clinic restroom (Filing No. 29-2 ¶ 19). Because the School District was not addressing A.C.'s problems, his mother, M.C., contacted a transgender advocacy organization, GenderNexus, for help. *Id.* ¶ 21. On November 3, 2021, GenderNexus, A.C., and M.C. met with the school counselor to discuss, among

other things, AC.'s need to use the boys' restroom. *Id.* The school continued to refuse to allow A.C. to use the boys' restroom but determined that it would no longer discipline him for being late to classes. *Id.* ¶ 22. The school also offered to allow A.C. to attend school remotely. *Id.*

Following the meeting with GenderNexus, contrary to the school's instructions, A.C. used the boys' restroom because it is where he felt most comfortable (Filing No. 29-3 ¶ 23). His use of the boys' restroom did not cause any issues with other students (Filing No. 29-4 at 65:6-11). But when a staff member saw him use the boys' restroom, A.C. was called to speak to an administrator, who reiterated that A.C. was not allowed to use the boys' restrooms and would be punished if he continued to do so (Filing No. 29-3 ¶ 25; Filing No. 29-4 at 64:7-12, 66:5-25).

Wooden Middle's refusal to recognize A.C. as a boy made him dread going to school and he was unable to focus there; he would come home depressed and humiliated (Filing No. 29-2 ¶¶ 31-33). A.C. being denied access to the boys' restroom mad him feel isolated; he constantly felt as though he was being singled out and was told that he does not deserve to be treated with respect (Filing No. 29-3 ¶ 29). There were multiple instances where A.C. called his mother to be picked up from school early because he was so upset (Filing No. 123-4 ¶ 4).

A.C.'s mother sought a preliminary injunction allowing him to use the boys' restroom. On April 29, 2022, the court entered preliminary injunctive relief allowing A.C. to use the boys' restroom at Wooden Middle and any other school within the School District (*see* Filing No. 50; Filing No. 87). A.C. consistently used the boys' restrooms for the remainder of his seventh-grade year and the entirety of his eighth-grade year (Filing No. 123-3 ¶¶ 6-7). To A.C.'s knowledge, no other student was concerned with his use of the boys' restroom. *Id.* ¶ 8.

### e. <u>Attending Martinsville High</u>

A.C. continued his use of the boys' multi-user restrooms at Martinsville High. *Id.* ¶ 13. Like the restrooms at Wooden Middle, the boys' restrooms at Martinsville High have stalls with

doors that close. *Id.* ¶ 15. Using the boys' restrooms, and the changes in his body caused by the continued administration of testosterone, has made A.C. much more comfortable as the boy that he is. *Id.* ¶ 30. He has several friends and is involved in several extracurricular activities including marching band, drumline, jazz band, concert band, quiz bowl, spell bowl, and he is on the science team. *Id.* ¶ 22.

Near some, but not all, of the boys' restrooms in Martinsville High, there is a single-occupancy faculty restroom (Filing No. 123-5 at 35:10-37:1; 39:4-40:1). A person entering the hallway to the restrooms must turn one way for the student restrooms and the other way for the faculty restroom. *Id.* at 36:13-37:1. There is also a single-use restroom available in the nurse's clinic in the high school and family restrooms located near the auditorium and gymnasium. *Id.* at 23:14- 17, 47:1-48:22.

Since A.C. is heavily involved with music, the restroom he uses most is the boys' restroom in the high school's music area (Filing No. 123-3 ¶ 24). There is no single-use faculty restroom adjacent to the boys' restroom in this location (Filing No. 123-5 at 39:14-40:1). There have been no problems caused by A.C. using the boys' multi-user restroom at Martinsville High. *Id.* at 55:22-56:8. No students have reported any problems regarding A.C.'s use of the boys' restrooms; only parents have expressed concerns, but those concerns were not documented. *Id.* at 56:3-57-3.

In August of 2023, the School District created a new policy titled "Administrative Guideline Regarding Accommodations for Transgender Students" (the "Policy") (Filing No. 123-5 at 85). A portion of the Policy concerns restroom access. *Id.* at 87-90. It states, among other things, that any request by a transgender student to use the restrooms associated with their gender identity must be approved by the principal of the building where the student is located as well as the school board. *Id.* at 87. The Policy provides that:

> If a principal decides to grant a bathroom accommodation request, accommodation shall be limited such that a student would be permitted to use the single-occupancy bathroom located within the boys' bathroom facility or girls' bathroom facility associated with the gender identity of the student so requesting . . . . *In no event may a principal permit a student to access or use the multi-use section of a bathroom facility where the sex designation for that bathroom facility differs from the student's biological sex at birth.*

*Id.* at 89 (emphasis added).

At the beginning of the 2023-2024 school year, the Assistant Principal of Martinsville High School told A.C. that he could use the single-use restrooms that were previously designated to be used only by faculty. *Id.* at 14:21-15:21. Currently, A.C. is the only student allowed to use the faculty restrooms. *Id.* at 40:21-41:1; 43:25-44:16. If the preliminary injunction were not in place, A.C. would be required to use the girls' restrooms or the restroom in the nurse's clinic. *Id.* at 18:16-19:1. Being forced to use the girls' restroom, or faculty restroom, would be a constant source of stress and anxiety to A.C. (Filing No. 123-3 ¶ 31). It would recreate all the negative experiences and feelings that he suffered before this Court's preliminary injunction. *Id.*

**B.**    **Procedural Background**

On December 3, 2021, A.C. filed this lawsuit against the School District seeking declaratory and injunctive relief that would assure his access to gender-affirming restrooms (Filing No. 1). That same day, A.C. filed a motion for preliminary injunction "allowing him to utilize male restrooms and in all other respects requiring [the School District] to treat him as male." (Filing No. 9). On April 29, 2022, the Court granted A.C.'s motion for preliminary injunction and issued the stand-alone order on May 19, 2022 (Filing No. 50; Filing No. 65). The injunction prohibited the School District from "stopping, preventing, or in any way interfering with A.C. freely using any boys' restroom located on or within the campus of [Wooden Middle] located in Martinsville, Indiana." (Filing No. 65).

On May 3, 2022, the School District filed a Notice of Appeal to the United States Court of Appeals for the Seventh Circuit (Filing No. 52). On August 1, 2023, the Seventh Circuit affirmed this Court's order granting A.C.'s motion for preliminary injunction (Filing No. 88). *See also A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 775 (7th Cir. 2023), cert. denied sub nom. Metro. Sch. Dist. of Martinsville v. A. C., 144 S. Ct. 683, 217 L. Ed. 2d 382 (2024).

On July 10, 2024, A.C. filed a motion for partial summary judgment (Filing No. 123). On August 7, 2024, the School District filed their response (Filing No. 127) and A.C. filed his reply on September 4, 2024 (Filing No. 142). The Motion is now ripe for consideration.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

## III.    DISCUSSION

A.C. moves for summary judgment, asking the Court for a declaratory judgment that the School District's failure to recognize him as male and to allow him to use the boys' restrooms, absent the preliminary injunction, violates both Title IX and the Equal Protection Clause of the Fourteenth Amendment. A.C. also requests a permanent injunction allowing him to continue to use the boys' restrooms at Martinsville High and any other school within the Metropolitan School District of Martinsville. A.C. assert that the amount of his damages should be established at trial.

The School District opposes partial summary judgment, offers opinions from a proposed expert, Dr. Kristopher Kaliebe ("Dr. Kaliebe"), and argues there are significant disputes of material fact that require credibility determinations which can only be made by a jury. In his Reply brief, A.C. seeks exclusion of Dr. Kaliebe's testimony (*see* Filing No. 142 at 5-7). The School District filed a Motion for Leave to File Surreply to address the admissibility of Dr. Kaliebe's testimony. In response, A.C. filed a Motion to File Sur-Surreply. The Court will first discuss the evidentiary issues before proceeding to A.C.'s claims under Title IX and the Equal Protection Clause respectively.

**A.    Motion for Leave to File Surreply**

A.C. objects to Dr. Kaliebe's report and argues the opinions in the report are not admissible under the principles of *Daubert* (Filing No. 126-4, Filing No. 142 at 5-7). The School District seeks to file a surreply to address arguments made in A.C.'s reply (*see* Filing No. 148-1).

The School District's proposed surreply is broken into three sections: (I) a response to A.C.'s request to strike Dr. Kaliebe's expert report; (II) argument that A.C.'s mental health records raise a genuine dispute of material fact; and (III) argument that Dr. Kaliebe's expert report is relevant to key issues on which A.C. has the burden of proof. A.C. does not object to allowing sections one and three of the School District's surreply (*see* Filing No. 151 at ¶¶ 4, 20, a).

Because Local Rule 56-1(d) allows a party to file a surreply when a movant objects to the admissibility of the evidence cited in the response, the School District's motion is **granted in part and denied in part**. The School District's proposed surreply brief submitted at Filing No. 148-1 is deemed filed as of the date of this Entry. However, the Court will not consider Section II on pages 5 through 9 because it improperly responds to arguments in the reply brief.

**B.    Motion to File Sur-Surreply**

A.C. seeks to file a response to Section I of the School District's surreply. A.C. argues they "should be able to file a brief sur-surreply to point out, among other things, that [the School District's] surreply erroneously contends that Dr. Kaliebe was recognized as an expert by this Court" (Filing No. 151 at 2). For the reasons discussed below, the Court finds that A.C.'s request to file a sur-surreply is unnecessary. A.C.'s Motion to File Sur-Surreply is therefore **denied**.

**C.    Motion to Strike**

Dr. Kalibe is a board-certified childhood and adolescent psychiatrist (Filing No. 148-1 at 1). His report discusses "how care of youth experiencing gender dysphoria has been distorted by the lack of an open, scientific dialogue regarding how to best treat patients with gender dysphoria"

(*see generally* [Filing No. 126-4](#)). Dr. Kaliebe opines that schools should be skeptical against activist-pushed treatments and that inclusive bathroom access policies have not been shown to avoid harms to the children they are aimed at helping. *Id.* at 27. Dr. Kaliebe also argues that familial issues outside of the School District's control caused A.C. harm.

A.C. points out that for expert testimony to be admissible, not only must that testimony "assist the trier of fact to understand the evidence or to determine a fact in issue"—a requirement that "goes primarily to relevance," id. at 591—but the witness offering the testimony must be "qualified . . . by knowledge, skill, experience, training, or education" and their opinion must be "based on sufficient facts or data" and "the product of reliable principles and methods." Fed. R. Evid. 702. A.C. argues that Dr. Kaliebe is not qualified to offer opinions concerning gender dysphoric youth and their treatment, and his opinions are not relevant on whether A.C. was discriminated against.  ([Filing No. 142 at 5-6](#)).

For the reasons discussed below, the Court finds that Dr. Kaliebe's opinions are not material to determining liability; instead, Dr. Kaliebe's opinion are relevant to damages which is not being assessed at this stage. Accordingly, the Court will not consider Dr. Kaliebe's opinions in determining whether summary judgment is appropriate on the issue of liability, and A.C.'s request to strike Dr. Kaliebe's expert report is **denied as moot**.[4]

**D.**    **Motion for Partial Summary Judgment**

**1.**    ***Whitaker* and *Bostock's* Authoritative Value**

The legal question here under Title IX is whether it violates the statute to deny a transgender student access to the restroom associated with their identity. A.C. contends that this question has

---

[4] Should this case proceed to trial on damages, A.C. may raise this objection in a Motion to Exclude.

already been answered by the Seventh Circuit in *Whitaker by Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F. 3d 1034, 1049-50 (7th Cir. 2017).

As recognized by the School District, "this Court is bound by the legal pronouncements of the Seventh Circuit" (Filing No. 127 at 20). In the appeal of this case, the Seventh Circuit addressed the School District's contention that *Whitaker* was no longer authoritative given the Supreme Court's intervening decision in *Bostock. See A.C.*, 75 F.4th at 767-71; *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 645 (2020).

On appeal, like in the current briefing before the Court, the School District maintained that *Bostock* provided intervening guidance on how to analyze issues of transgender discrimination and argued that this Title IX claim should be resolved based upon the statutory text enacted by Congress. *A.C.*, 75 F.4th at 768; (Filing No. 127 at 20). The Seventh Circuit held that when applying *Bostock's* reasoning to Title IX, "discrimination against transgender persons is sex discrimination for Title IX purposes, just as it is for Title VII purposes." *A.C.*, 75 F.4th at 769. The Seventh Circuit also held that because Title IX, nor its implementing regulations, define the term "sex," bathroom-access policies that engaged in sex-stereotyping could violate Title IX, notwithstanding the provisions of 34 C.F.R. §106.33, or similarly, 20 U.S.C. §1686. *Id.* at 770.

The Court acknowledges the School District's disagreement with the holding of the Seventh Circuit and their argument is properly preserved for appeal. However, in the absence of additional guidance from the United States Supreme Court, this Court need not depart from the precedent set forth by the Seventh Circuit.

## 2.    Title IX

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…" 20 U.S.C. § 1681(a).

To support a Title IX claim, a plaintiff must show (1) that the educational institution intentionally discriminated against the plaintiff based on the plaintiff's sex, and (2) that "gender was a motivating factor in the decision to impose the discipline." *Doe v. Indiana Univ.-Bloomington*, 2019 WL 341760, at *8 (S.D. Ind. Jan. 28, 2019) (quoting *King v. DePauw Univ.*, 2014 WL 4197507, at *10 (S.D. Ind. Aug 22, 2014)). Title IX protections apply to transgender people. *See Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1048-49 (7th Cir. 2017) (noting that a transgender plaintiff has the ability to bring a Title IX claim under a sex stereotyping theory).

In *Whitaker*, plaintiff, a transgender boy who was diagnosed with gender dysphoria, sought to use the boys' restroom at his high school. *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1040 (7th Cir. 2017). The high school denied plaintiff's request but allowed him to use the girls' restrooms or a gender-neutral restroom that was located in the school's main office. *Id.* The Seventh Circuit reasoned that "[a] policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX." *Id.* at 1049.

Here, like in *Whitaker*, the School District has a policy that punishes transgender students for his or her gender non-conformance (*see* Filing No. 123-5 at 89). The Policy prohibits students from accessing or using "the multi-use section of a bathroom facility where the sex designation for that bathroom facility differs from the student's biological sex at birth." *Id.* Therefore, despite A.C.'s birth certificate stating that he is male, the School District still forbids him from using the boys' bathroom. This is a clear violation of Title IX as A.C. is subjected to different rules and treatment than non-transgender students.

The School District argues that the question the Court should be asking, and the jury must decide, is "whether the accommodations offered by the [School District] amounted to treating A.C. 'worse' than biological boys at [Martinsville]." (Filing No. 127 at 17). The School District contends that the accommodations provided by Martinsville are distinguishable from the accommodations provided in *Whitaker* or even at Wooden Middle because it is a single-user male restroom that is located directly next to the multi-occupancy restrooms.

The Court need not grapple with whether the accommodations provided by Martinsville are better, or worse, than those provided in *Whitaker* or at Wooden Middle. Rather, the Court must decide if A.C. was treated "different" because of his transgender status. *See Bostock*, 590 U.S. at 657 (noting that the word "discriminate" means to "make a difference in treatment or favor (of one as compared with others)"). It is undisputed that A.C. was treated different from non-transgender students. Non-transgender males at Martinsville have the ability to use *any* boys' bathroom of their choosing, including the multi-user boys' bathroom. A.C. is not provided this same freedom. Due to Martinsville's policy, A.C. is limited to using the girls' bathroom (which does not conform to his gender identity) or the single-user male bathroom. This is clear and undisputed evidence that A.C. is treated different because of his transgender status and subjects the School District to Title IX liability. *See Whitaker*, 858 F.3d at 1050 ("Providing a gender-neutral alternative is not sufficient to relieve the School District from liability, as it is the policy itself which violates the Act."). Accordingly, A.C. is entitled to judgment as a matter of law on his Title IX claim.

### 3.    **Equal Protection**

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It is "essentially a direction that all persons similarly situated should be treated alike."

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "It therefore, protects against intentional and arbitrary discrimination." *Whitaker*, 858 F.3d at 1051.

The School District argues the Court should refrain from addressing A.C.'s Equal Protection claim consistent with the Constitutional Avoidance Doctrine. *See, e.g. Burton v. United States*, 196 U.S. 283, 295 (1905). The Constitutional Avoidance Doctrine is a set of rules that guide federal courts on how to handle cases that raise constitutional questions. The fourth rule, also known as the "Last Resort Rule," advises courts to resolve cases on non-constitutional grounds when possible. It states:

> The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of. This rule has found most varied application. Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter.

*Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347 (1936).

The Last Resort Rule is not applicable here. A.C.'s case cannot be decided solely on his Title IX claim because of the relief he seeks.[5] Punitive damages and damages for emotional distress are unavailable under Title IX. *See Doe v. Loyola Univ. Chicago*, 100 F.4th 910. 912 (7th Cir. 2024) ("[P]unitive damages are unavailable in private litigation under laws based on the Spending Clause. Title IX is such a law; it applies only to institutions that accept federal funds… damages for emotional distress also are unavailable under Spending-Clause statutes."). Therefore, the Equal Protection issue must be decided to establish that A.C. is entitled to damages based on emotional distress and physical discomfort.

---

[5] The School District offers *B.E. v. Vigo Cnty. Sch. Corp.*, 608 F. Supp. 3d 725 (S.D. Ind. 2022), to support its position that only the Title IX claim needs to be decided. In *B.E.*, the court did not address plaintiffs Equal Protection Clause argument because they were likely to succeed on the merits of their Title IX claim. *Id.* at 729. This case is distinguishable as its procedural posture was different than the instant case; the court was ruling on a Motion for Preliminary Injunction, which is relief that could be provided under Title IX *or* an Equal Protection claim. *See id.*

"Generally, state action is presumed to be lawful and will be upheld if the classification drawn by the statute is rationally related to a legitimate state interest." *Id.* (quoting *City of Cleburne*, 473 U.S. at 440). However, "[p]er Whitaker's guidance, [the School District's] access policy relies on sex-based classifications and is therefore subject to heightened scrutiny." *A.C.*, 75 F.4th at 772 (citing *Whitaker*, 858 F.3d at 1051). Heightened scrutiny requires a party seeking to uphold government action based on sex to show that the justification for the classification is "exceedingly persuasive." *United States v. Virginia*, 518 U.S. 515, 533 (1996). An exceedingly persuasive justification requires the state to demonstrate that the "classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* "The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Id.*

The School District argues that separate bathrooms by sex serves an important objective of protecting the interests of students in using the restroom away from the opposite sex and in shielding their bodies from exposure to the opposite sex. The Court does not evaluate the School District's decision to maintain sex-segregated facilities; instead, the Court solely evaluates the School District's facility access policy.

The School District fails to provide an exceedingly persuasive justification for their discriminatory restroom policy. The privacy concerns addressed by the School District are hypothetical and do not reflect a genuine governmental objective because no student has complained about A.C.'s use of the boys' restroom. The School District contends that A.C.'s deposition testimony is evidence that students have complained about his use of the boys' restroom (*see* Filing No. 127 at 30), but that is a mischaracterization of the evidence. A.C. testified that students approached him about the lawsuit, and he received some negative comments. *Id.* at 13

18

[45:5-12]. The negative comments were people "calling [him] names, saying [he] was wrong and just overall disrespecting [him]." *Id.* [45:22-46:3]. Negative comments about A.C.'s transgender's status is not equivalent to students expressing privacy concerns regarding restroom usage. To the extent the School District argues parent complaints are evidence of the need to protect students' privacy rights, it is not. *See Whitaker*, 858 F.3d at 1052 (holding that the school district's privacy argument was based upon sheer conjecture and abstraction when only some parents complained about a transgender student using the restroom of their choosing because the school district had not "received any complaints *from other students*.") (emphasis in original).

Next, the School District attempts to draw a distinction between the boys' restroom at Wooden Middle and the boys' restroom at Martinsville High. The School District argues that because "the urinals [are] right up front where they are unavoidable, and there are no partitions" this underscores the privacy considerations. Irrespective of the set-up of the boys' restroom, the privacy concerns argued by the School District are not threatened by A.C.'s presence in the boys' restroom. *See Whitaker*, 858 F.3d at 1052 ("Common sense tells us that the communal restroom is a place where individuals act in a discreet manner to protect their privacy and those who have true privacy concerns are able to utilize a stall.").

Lastly, the School District argues A.C.'s Equal Protection claim must fail because he submitted no evidence that it acted with a "nefarious discriminatory purpose" in implementing the restroom policy. To state a claim of equal protection based on sex under § 1983, a plaintiff must allege that defendants "discriminated against [them] based on [their] membership in a definable class" and that defendants "acted with a nefarious discriminatory purpose." *Nabozny v. Podlesny*, 92 F.3d 446, 453 (7th Cir. 1996). A nefarious purpose can be proven if the School District acted "either intentionally or with deliberate indifference." *Id.* at 454.

19

The School District contends that the policy, as a matter of fact, cannot be found to discriminate against transgender individuals because the policy pertains to both transgender and gender-nonconforming students (Filing No. 127 at 32). Specifically, the School District argues that because gender-nonconforming individuals can be cisgender, the policy was not intended to discriminate against only transgender students. *See id.* The School District is referring to *one sentence* of the seven-page Policy titled "Administrative Guideline Regarding Accommodations for Transgender Students." (Filing No. 126-3 at 1, 2) (emphasis added). The portion of the policy at issue is directed at students who desire to use school restrooms that are different than their sex at birth but consistent with their gender identity. *Id.* at 3. In no way could this part of the policy be targeted at gender-nonconforming, cisgender individuals as the School District claims. Gender-nonconformance has to do with gender expression, *not* gender identity.

The School District's policy shows intentional discrimination on the basis of sex. A.C. has pointed to undisputed evidence that the School District's policy could not be stated without referencing sex and that policy treated transgender students like A.C. differently. The policy does not serve an important governmental objective and the discriminatory means in which the School District tries to achieve this objective is not substantially related. Moreover, the policy was created with a nefarious purpose. Accordingly, A.C. is entitled to judgment as a matter of law on his Equal Protection Claim.

**4.    <u>Requested Relief</u>**

A.C. requests a declaratory judgment and a permanent injunction allowing A.C. to continue using the boys' restrooms at Martinsville. To obtain a permanent injunction at the summary judgment stage, a plaintiff must show:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy

in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, LLC*, 547 U.S. 988, 391 (2006). In addition, a plaintiff must also show success, as opposed to a likelihood of success, on the merits. *Collins v. Hamilton*, 349 F.3d 371, 374 (7th Cir. 2003). As discussed above, A.C. has been successful on the merits of his case under both Title IX and the Equal Protection Clause of the Fourteenth Amendment. The Court will discuss the remaining factors in turn.

The Court finds that A.C. has carried his burdens. A.C. has demonstrated that he has suffered an irreparable injury. *See Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm."). Absent a permanent injunction, A.C. would be subjected to the School District's Policy and required to use the single-use faculty restroom. This would cause A.C. the same emotional harm that accompanied the original denial of his access to the boys' restrooms at Wooden Middle (*see* Filing No. 123-3 ¶ 31). Moreover, monetary damages are not enough to fully rectify the emotional harm identified by A.C. *J.A.W. v. Evansville Vanderburgh Sch. Corp.*, 323 F. Supp. 3d 1030, 1039-40 (S.D. Ind. 2018); *see also Whitaker*, 858 F.3d at 1054.

The Court also finds, after balancing the harms to each party, that a remedy for A.C. is warranted. A.C. has provided evidence of the harm he will face if a permanent injunction is not granted. The School District offers no evidence of potential harm they would face if the permanent injunction were granted. For the past two years, A.C. has used the boys' restroom, as required by the preliminary injunction. During this time, there has been no evidence submitted that his use of the boys' restroom has caused harm to Martinsville High or the School District as a whole.

Lastly, the public interest weighs in favor of issuing the permanent injunction. Protecting civil and constitutional rights is always in the public's interest and would cause no harm. Having

determined that granting A.C.'s permanent injunction is in the public interest, as well as A.C. establishing the other required factors, the Court finds that A.C.'s requested permanent injunction should be **granted**.

## IV.    <u>CONCLUSION</u>

Litigation over transgender rights is a relatively new topic and while some circuits disagree on the issues raised in this case, the Seventh Circuit has affirmatively decided that denying gender-affirming restroom access can violate both Title IX and the Equal Protection Clause. For the reasons stated above, the School District's policy has violated both Title IX and the Equal Protection Clause. For the reasons explained above, the School District's Motion for Leave to File Surreply ([Filing No. 148](#)) is **GRANTED in part and DENIED in part**, and A.C.'s Motion to File Sur-Surreply ([Filing No. 151](#)) is **DENIED**. A.C.'s Motion for Partial Summary Judgment ([Filing No. 123](#)) is **GRANTED** in favor of A.C. on his Title IX and Equal Protection claims as to liability only. The amount of damages, if any, on these claims must be determined by the trier of fact. A.C.'s request for a permanent injunction is also **GRANTED**.

Pursuant to Federal Rule of Civil Procedure 65(d)(1)(C), the permanent injunction will issue under separate order.

**SO ORDERED.**

Date:    1/7/2025

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Jonathan Lamont Mayes
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
jmayes@boselaw.com

Stevie J. Pactor
ACLU OF INDIANA
spactor@aclu-in.org

Megan Stuart
INDIANA LEGAL SERVICES, INC. (Bloomington)
megan.stuart@ilsi.net

Mark Wohlford
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
mwohlford@boselaw.com

Philip R. Zimmerly
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
pzimmerly@boselaw.com